# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAT PAUL VERMA, | : | CIVIL ACTION NO. 4:20-CV-14 |
| Petitioner | : | (Chief Judge Conner) |
| v. | : | |
| CLAIR F. DOLL, Warden of the York County Prison, *et al.*, | : | |
| Respondents | : | |

## MEMORANDUM

Petitioner Sat Paul Verma is a civil detainee in the custody of the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE") at York County Prison. Respondent is Clair Doll, the Warden of the York County Prison.[1] Verma brings this habeas action under 28 U.S.C. § 2241, seeking immediate release from ICE detention. (See Doc. 8). He brings what appear to be challenges to his confinement at the York facility under due process deliberate indifference and conditions-of-confinement theories. For the reasons that follow, we will deny Verma's request for immediate release.

I. **Factual Background & Procedural History**

   A. **Verma's Criminal History and Deportation Proceedings**

Verma is a citizen of India who entered the United States without inspection in 1982. (See Doc. 1 ¶¶ 8-9; Doc. 3-1 at 4). He became a lawful permanent resident

---

[1] Doll is the only proper respondent as the person with custody over Verma. See Rumsfeld v. Padilla, 542 U.S. 426, 434 (2004) (citing 28 U.S.C. § 2242).

of the United States on December 1, 1990. (Doc. 1 ¶ 8). Since his entry, Verma has had several interactions with law enforcement. In February 1983, Verma was arrested for sexual assault and resisting an officer. (Doc. 3-1 at 5). Roughly six years later, Verma was arrested by the Atlantic City Casino Gambling Enforcement Unit for "Commercial Sex Offense." (Id.) He was convicted of that offense and fined $555. (Id.) Verma was fined again 17 years later following complaints for "Abuse or Kill of an Animal." (Id.) On February 8, 2018, Verma was convicted in the District of New Jersey for "Access Device Fraud" in violation of 18 U.S.C. § 1029(a)(5). (Id.) Verma was sentenced to 12 months' imprisonment and three years of supervised release for his conduct, which resulted in a total loss of $270,000. (Doc. 3-1 at 5). Verma was released into ICE custody on March 22, 2019, after serving his prison sentence. (Doc. 13 at 7).

Verma also has a mixed history with immigration authorities. In 1984, Verma was investigated for marriage fraud. (Doc. 3-1 at 4). He was suspected of marriage fraud again in 1986. (Id.) Verma applied for naturalization in December 2011. (Id.) His application was "denied based on false testimony given under oath with the intent to obtain an immigration benefit." (Id.)

After his access-device-fraud conviction, the Department of Homeland Security ("DHS") initiated removal proceedings by filing a Notice to Appear. (Doc. 1-1 at 1; see also Doc. 3-1, Ex. 2). DHS charged Verma as removable pursuant to Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act as an alien convicted of an aggravated felony involving fraud or deceit that caused more than $10,000 in losses. (Doc. 1-1 at 1). Verma's motion to terminate removal proceedings was

2

denied by an immigration judge. (See Doc. 1-1). Verma was ordered removed on September 25, 2019. (See Doc. 3-1, Ex. 5).

### B.  Conditions at York County Prison

York County Prison houses ICE detainees and civil detainees. (Doc. 13-1, Ex. 2 ¶ 2). The prison can house 2,245 individuals at any given time, but only 1,376 currently reside there. (Id., Ex. 1 ¶ 5). One York County Prison detainee has tested positive for COVID-19. (Id. ¶ 7). York County Prison and ICE have recently implemented new safeguards to prevent the spread of COVID-19 in the prison. As described by DHS's Assistant Field Office Director for Immigration and Customs Enforcement, Joseph Dunn, as of April 3, 2020:

> [T]he York County Prison now requires all staff working within CERT activation, medical transport, mail processing; admissions and intake, temperature monitors, cohorted housing units, working directly with detainees on isolation status, and all medical staff be fitted for and wear an N95 mask. All kitchen staff are now assigned surgical masks. Detainees who work in the kitchen are required to wear surgical masks. Detainees on isolation status are required to wear a N-95 mask when they leave a cohorted housing unit. Additionally, any detainees being transported to a hospital or outside medical appointment or as directed by PrimeCare medical staff, will be required to wear a surgical mask.

(Doc. 13-1, Ex. 1 ¶ 8(a)).

ICE has also temporarily suspended social visitation and limited professional visitations to noncontact visits. (Id., Ex. 2 ¶ 15). And all staff and vendors are screened, including for body temperature, when they enter ICE facilities. (Id. ¶ 16). Detainees with certain disabilities are provided reasonable accommodations as needed and appropriate. (Id. ¶ 7). New detainees are subjected to enhanced intake

3

screenings, and new and current detainees are frequently assessed for COVID-19 symptoms. (Id. ¶ 7-8). In cases in which a detainee is known to have been exposed to COVID-19, asymptomatic detainees are placed in isolated cohorts for a 14-day period and are monitored for fever and symptoms of respiratory illness. (Id. ¶ 10). Cohorting ends when 14 days have passed with no new cases. (Id.) York County Prison also maintains a 24/7 medical staff, (id. ¶ 11(a)), and ICE provides education materials to staff and detainees to inform them of ways to limit the spread of COVID-19, (id. ¶ 18). Finally, high-traffic areas are cleaned frequently, and detainees are given soap, disinfectant, gloves, and masks as requested. (Id. ¶ 14).

### C. Verma's Medical History, Condition, and Treatment

Verma is 67 years old and has a significant medical history. (See Doc. 1 ¶¶ 8-9). In 2017, Verma had four stents placed in his heart to treat a cardiovascular disease. (Doc. 6 at 7-10, 74). He also has a slightly above-average A1C level, putting him within the prediabetes range and increasing the likelihood that he develops diabetes. (Id. at 74). ICE has put him on the chronic care list "for, among other issues, cardiac stents, elevated lipids, calculi, ptergium, and diverticulosis." (Doc. 13-1, Ex. 1 ¶ 6). Verma takes medication to treat high blood pressure, high cholesterol, angina, and vertigo. (Doc. 6 ¶ 6). He also takes over-the-counter pain medication as needed. (Id.) Verma has been taking this course of medication since he entered prison in 2018. (Id. ¶¶ 6-9).

Verma claims that as of February 24, 2020, he had not been seen by a doctor at York County Prison, despite requesting to see a cardiologist. (Id. ¶¶ 9, 10). He asserts that he had only been treated by nurses, who merely provided him with his

4

daily medications.  (Id. ¶ 10).  Verma states that his symptoms have gotten worse since his incarceration.  (Id. ¶ 11).  He also claims that he has developed a variety of new, untreated symptoms.  (Id. ¶¶ 11-16).  Notably, Verma has not indicated that he has shown symptoms of COVID-19 or that he has received inadequate preventative care with respect to COVID-19.

### D. Procedural History

Verma's original Section 2241 petition was filed on January 3, 2020. Respondent filed a response to that petition, but Verma has yet to file a reply.  On April 1, 2020, before his initial petition was resolved, Verma filed the instant emergency petition for immediate release.  We ordered expedited briefing. Respondent opposed Verma's petition and Verma filed his reply.  The emergency petition is now ripe for disposition.

## II. Legal Standard

Motions for temporary and preliminary injunctive relief are governed by a four-factor test.[2]  The movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm. Reilly v. City of Harrisburg, 858 F.3d 173, 179 (3d Cir. 2017).  Under the first factor, the movant must show that "it can win on the merits."  Id.  This showing must be

---

[2] Temporary restraining orders and preliminary injunctions are governed by "nearly identical factors," the principal distinctions being in procedure and effect.  Singer Mgmt. Consultants, Inc. v. Milgram, 650 F.3d 223, 236 n.4 (3d Cir. 2011).  Unlike a preliminary injunction, a temporary restraining order can issue without notice to the adverse party and will dissolve on its own, unless extended by the court or with consent of the adverse party under Federal Rule of Civil Procedure 65(b)(2).  Id.

5

"significantly better than negligible but not necessarily more likely than not." Id. The second factor carries a slightly enhanced burden: the movant must establish that it is "more likely than not" to suffer irreparable harm absent the requested relief. Id. Only if these "gateway factors" are satisfied may the court consider the third and fourth factors, which aim to balance the equities by examining the potential for harm to others if relief is granted and whether the public interest favors injunctive relief. Id. at 176, 179. The court must then balance all four factors to determine, in its discretion, whether the circumstances warrant injunctive relief. Id. at 179.

## III. Discussion

In his emergency Section 2241 petition, Verma asserts he should be released from ICE detention because he is uniquely susceptible to contracting COVID-19 and subsequently dying from the disease it causes. Verma's emergency petition does not identify specific legal theories under which he claims entitlement to immediate release. He instead generally references the conditions of his confinement and analogizes to our colleague's recent decision in Thakker v. Doll, ___ F. Supp. 3d ___, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020) (Jones, J.), which involved Fifth and Eighth Amendment claims. We assume, as respondent has, that Verma challenges the conditions of his confinement under similar theories. As discussed below, Verma has not carried his burden of establishing that his immediate release is warranted. We will therefore deny his emergency petition.

### A. Section 2241 and the Scope of Habeas Jurisdiction

Respondent submits that we lack jurisdiction to entertain Verma's Section 2241 petition and grant his requested relief, immediate release from ICE detention. They alternatively posit that the court should dismiss Verma's petition because it was brought in an unrelated, preexisting case and is untethered to Verma's original petition. We dispose of this latter argument in short order. We will not dismiss Verma's emergency petition merely because he filed it under the same docket number as his pending Section 2241 petition. We will simply treat the instant Section 2241 petition as an amendment to his original filing and defer judgment on his original petition. See Grullon v. Ashcroft, 374 F.3d 137, 138 (2d Cir. 2004) (citing Ching v. United States, 298 F.3d 174 (2d Cir. 2002)); see also Woods v. Carey, 525 F.3d 886, 889,90 (9th Cir. 2008).

As to the former claim, we disagree with respondent and incorporate the *ratio decidendi* applied in Camacho Lopez v. Lowe, No. 3:20-CV-563, 2020 WL 1689874, *4-6 (M.D. Pa. Apr. 7, 2020) (Conner, C.J.), to conclude that we have jurisdiction to entertain Verma's claims. Verma plainly seeks a habeas remedy. He does not ask for an order compelling York County Prison to change their policies or seek to impose any sort of liability on the prison. He requests immediate release from custody based on what he perceives to be constitutionally deficient conditions of confinement that threaten his health and life. This is a habeas remedy. See Preiser, 411 U.S. at 500; Leamer, 288 F.3d at 540-41; Camacho Lopez, 2020 WL 1689874, at *4.

As for whether conditions-of-confinement claims are cognizable in habeas, we canvassed existing Supreme Court and Third Circuit precedent to conclude that, in narrow circumstances, they are. We observed that our court of appeals has signaled that an "extreme" conditions-of-confinement claim can support habeas relief. See Camacho Lopez, 2020 WL 1689874, at *5 (quoting Ali v. Gibson, 572 F.2d 971, 975 n.8 (3d Cir. 1978), superseded by statute on other grounds as stated in Callwood v. Enos, 230 F.3d 627, 633 (3d Cir. 2000)). We also noted that the Third Circuit has said that claims that go to the very "execution" or "carrying out" of a period of confinement, even if they do not oppugn the validity of that confinement, are properly brought in habeas. See id. (quoting Woodall, 432 F.3d at 236). We interpreted those decisions as authorizing a very limited subset of non-"core" conditions-of-confinement habeas claims.

Verma's claims fall within that limited subset. The extreme reach and severe consequences of COVID-19 are well documented.[3] Prisons present unique concerns regarding the spread of this virus; by their very nature, prisons are confined spaces unsuited for "social distancing." (See Doc. 8-1, Ex. 2 ¶¶ 29-30). The gravity of this situation is heightened by the fact that an ICE detainee at the York facility has tested positive for COVID-19. (See Doc. 13-1, Ex. 1 ¶ 7(a)). And media reports indicate that two inmates at another Pennsylvania prison recently died from the

---

[3] See *Coronavirus Disease 2019 (COVID-19): Situation Summary*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html.

virus.[4]  Exposure to this environment for someone unusually susceptible to both contracting this virus and experiencing serious complications therefrom fundamentally changes the "execution" or "carrying out" of that person's confinement.  In light of all of the facts before us, including but not limited to his age and medical history, we conclude that Verma has established sufficiently "extreme" circumstances warranting exercise of our jurisdiction.

**B.     Request for a Temporary Restraining Order**

We must now determine whether Verma has demonstrated a likelihood of success on the merits of his conditions-of-confinement claims, whether he is likely to suffer irreparable harm, and whether the equities support the requested relief.  We address each issue in turn.

### 1.     *Likelihood of Success on the Merits*

Reading his petition liberally, we can glean due process and deliberate indifference claims.  Verma has failed to show that he will likely succeed on either.

As to the due process claim, civil immigration detainees are entitled to the "same due process protections" as pretrial detainees.  E.D. v. Sharkey, 928 F.3d 299, 306-07 (3d Cir. 2019).  In other words, immigration detainees must establish that their confinement falls below constitutional minimums.  Id.  To do so, Verma must show that the conditions of confinement at York County Prison amount to

---

[4] See Joseph Kohut, *Two Pike County inmates die from coronavirus; seven staff members, five other inmates test positive*, THE TIMES-TRIBUNE (Apr. 8, 2020), https://www.thetimes-tribune.com/coronavirus/two-pike-county-inmates-die-from-coronavirus-seven-staff-members-five-other-inmates-test-positive-1.2615732.

"punishment" lacking any reasonable relationship to "a legitimate governmental objective." Bell v. Wolfish, 441 U.S. 520, 535, 539 (1979).

Verma cites expert declarations submitted in Thakker to prove that York County Prison has not, and cannot, implement sufficient procedures to protect him from COVID-19. First, as set forth herein, respondent has submitted declarations establishing that the prison has taken reasonable steps in response to COVID-19 pandemic to minimize the virus's spread and maintain sanitary prison conditions. Second, Verma's reliance on declarations submitted on behalf of *different* petitioners in another case does not establish the individualized harm necessary to succeed on his conditions-of-confinement claim. Verma relies on declarations by Dr. Jonathan Louis Golob and Dr. Joseph J. Amon, which were submitted in support of the Thakker petitioners' claims. (Doc. 8 ¶¶ 5, 7, 8; Doc. 11 ¶ 3). Dr. Golob's declaration describes COVID-19, its impact, its symptoms, and its means of transmission. (See generally Doc. 8-1, Ex. 3). He also explains that certain people— like those over the age of 50 and those with specified preexisting conditions—are particularly at risk. (Id. at ¶ 14). Dr. Golob's conclusions are well-taken and we acknowledge that Verma is vulnerable to contracting COVID-19 and experiencing serious complications.

Dr. Amon's declaration, on the other hand, describes conditions specific to the Thakker petitioners and their experiences in the facilities they were detained in. Indeed, Dr. Amon explained that "[b]ased upon the *declarations of [petitioners]*, . . . York County Prison . . . do[es] not appear to be adopting the procedures necessary to prevent COVID-19 transmission." (Id., Ex. 2 ¶ 31 (emphasis added)). He went on

to explain that, "[i]n the York facility, *plaintiff declarations* stated a range of concerns that suggest an inability to control transmission of COVID-19." (Id. ¶ 32 (emphasis added)). Verma has not submitted any evidence that describes his environment in York County Prison or corroborates the statements in Dr. Amon's declaration. Put simply, Verma has not described *his* conditions or *his* treatment during the COVID-19 pandemic. Without particularized evidence, we cannot conclude that he is being unconstitutionally "punished" by remaining in detention.

Verma's claim also fails to the extent he attempts to bring a deliberate indifference conditions-of-confinement claim sounding in Eighth Amendment doctrines, but rooted in the Due Process Clause. Detainees' due process rights include protections available to convicted prisoners under the Eighth Amendment. See Reynolds v. Wagner, 128 F.3d 166, 173 (3d Cir. 1997) (citing Boring v. Kozakiewicz, 833 F.2d 468, 472 (3d Cir. 1987)); Edwards v. Northampton County, 663 F. App'x 132, 135 (3d Cir. 2016) (nonprecedential). In the prisoner context, the Supreme Court has defined deliberate indifference as existing only if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

Farmer, 511 U.S. at 837.[5] The standard is lower for detainees, who must show that the detaining official knew or should have known of, and consciously disregarded, the claimed risk. See Woloszyn v. County of Lawrence, 396 F.3d 314, 320-21 (3d Cir. 2005) (citations omitted).

Verma relies on Judge Jones' discussion in Thakker to argue that York County Prison has not adopted effective means to prevent the spread of COVID-19. (Doc. 8 ¶ 5). We are viewing a markedly different record. In response to concerns regarding the spread of COVID-19 in detention, the York County Prison has implemented extensive precautions designed to limit the spread of the virus. (Doc. 13-1, Ex. 1 ¶ 8; Doc. 13 at 8). For example, York County Prison now requires a variety of staff members to be fitted for and wear N95 masks. (Doc. 13-1, Ex. 1 ¶ 8). Detainees must wear surgical masks while in the kitchen; must wear N95 masks when leaving a cohorted housing unit; and must wear surgical masks while being transported to a hospital, to an outside medical appointment, or as directed by medical staff. (Id.)

There is no perfect solution to preventing the spread of COVID-19 in detention facilities, but York County Prison officials have taken reasonable steps to

---

[5] To the extent Verma claims he has received constitutionally deficient medical treatment, he must show that (1) he has a serious medical need and (2) that acts or omissions of detaining officials "indicate deliberate indifference to that need." Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003) (citing Estelle v. Gamble, 429 U.S. 97, 103-04 (1976); Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)). This theory also fails. Verma has not shown officials have disregarded a medical condition related to COVID-19 or neglected to offer appropriate treatment.

limit the spread throughout its facility. (See also Doc. 13 at 8-11). Verma has not established a conscious disregard for the risk posed by COVID-19. Respondent's conduct does not constitute deliberate indifference.[6]

### 2. *Irreparable Harm*

Verma must also show that he is "more likely than not" to suffer irreparable harm if a temporary restraining order is not granted. Reilly, 858 F.3d at 179. Irreparable harm is injury of such an irreversible character that prospective judgment would be inadequate to make the movant whole. See Anderson v. Davila, 125 F.3d 148, 163 (3d Cir. 1997); Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989). Mere risk of injury is not enough. Rather, the moving party must establish that the claimed harm is imminent and probable. Anderson, 125 F.3d at 164. The requirements of irreparable harm and likelihood of success on the merits are correlative: that is, the weaker the merits showing, the more will be required on the showing of irreparable harm, and vice versa. See Reilly, 858 F.3d at 179 (quoting Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co., 582 F.3d 721, 725 (7th Cir. 2009) (Easterbrook, J.)).

To establish irreparable harm, Verma similarly claims that he will suffer irreversible injury because he is uniquely susceptible to contracting the virus. We acknowledge his vulnerability to complications should he contract COVID-19, but

---

[6] We are aware of our colleague's recent order in Hope v. Doll, 1:20-CV-562, Doc. 11 (M.D. Pa. Apr. 7, 2020), granting a temporary restraining order. That order, however, has since been stayed and that court has not had the opportunity to analyze the petitioners' likelihood of success on the merits. Id., Doc. 13.

Verma again faces an evidentiary problem. The record is devoid of evidence of his individual circumstances. For example, there is no indication in the record before us that he would barred from moving to a tailored living arrangement given his age and preexisting medical conditions. It is possible that Verma may presently be eligible for quarantine. Nor has Verma submitted any evidence to suggest that he will be safer if he were released from ICE custody. In sum, Verma has failed to show he is "more likely than not" to suffer imminent and irreparable harm if he remains in detention. Reilly, 858 F.3d at 179.

### 3. *Balancing of Equities*

Because the "gateway factors" have not been satisfied, we need only briefly discuss the possibility of harm to the nonmovant and the public interest. Id. at 176, 179. But we would be remiss if we failed to point out that Verma's criminal—and immigration—history is worrisome. (Doc. 3-1 at 4-5). And following his most recent fraud conviction, Verma was ordered removed. (Id. at 19). Respondent and the public have an interest in enforcement of removal orders, see Nken v. Holder, 556 U.S. 418, 436 (2009), and Verma's continued detention furthers that interest. We also note that Verma's legal detention isolates him from society at large and allows him to receive appropriate medical care free of charge. The governmental and public interests thus align to support denial of a temporary restraining order.

## IV. **Conclusion**

For the foregoing reasons, the court will deny Verma's emergency petition (Doc. 8) for immediate release from ICE detention. An appropriate order shall issue.

                                             /S/ CHRISTOPHER C. CONNER
                                             Christopher C. Conner, Chief Judge
                                             United States District Court
                                             Middle District of Pennsylvania

Dated:    April 9, 2020